Mr. Patrick, whenever you're ready, we'll be glad to hear from you. May it please the Court, I'm Michael Patrick from Chapel Hill. I've been appointed to represent on appeal David Mayhew. I did not represent him at the trial level or at sentencing. We appreciate very much your undertaking representation of Mr. Mayhew. David Mayhew Thank you, Your Honor. I raised a number of issues in this case. I want to concentrate on three of them, but before I get into that, he obviously was convicted in the Eastern District of North Carolina in a case arising out of what's been called a Ponzi scheme that continued for several years and involved multiple charges against him. He was convicted on multiple counts of money laundering, wire fraud, and mail fraud. I want to raise three issues primarily. First is the Rule 29 issues on the wire fraud and money laundering and mail fraud counts that we identified in our brief. The second would be on the willful blindness jury instruction. And the third issue I want to talk about is really the degree of the upper variance or departure that raised his guideline sentence from 108 months to 320 months in this particular case. But turning first to the first issue, I divide this into two, the Rule 29 issues in the two. On wire fraud and money laundering, there was really no evidence that Mr. Mayhew were involved in the transactions and did anything with regard to either transfer or the wires that constituted the substantive wire fraud counts in this case. He did not control any of the monetary accounts through which any of the money flowed. There was no evidence that he had any authority over those accounts to initiate anything or to receive those or to transfer any of the money in the five or six counts involving the wire fraud or the money laundering. There's just no evidence that he did anything with regard to the substantive transactions that constitute those. Now, in regard to the mail fraud, we had conceded that there were three mail fraud counts. I'm sorry, there were three mail fraud counts, all of which involved mailing of account statements from Travis Cox to Frank McGrath. And there was evidence that my client had provided information to Cox as to the information to be put in those account statements. And then Cox made up the account statements and then actually mailed them to Frank McGrath. And that's the basis for the mail fraud counts and those things. But as we pointed out, there needs to be some evidence that my client knew or had some reasonable anticipation that mail would be used in that case. And there's really no evidence of that. The government pointed to the Pierce case, I believe. And we came back in a reply brief and pointed out that that really was a very different set of facts than what we have in this case. In this case, Cox and McGrath knew each other. They saw each other at the gym a couple times a week. Cox lived pretty close to each other. There's no grounds, unlike Pierce, that would have caused my client to have any anticipation that the account statements would actually have been mailed rather than just physically handed from Travis. Would it be sufficient for the government to prove that the use of the mails was reasonably foreseeable? Well, that's what I'm saying. What we're saying is that there's no evidence to say it was reasonably foreseeable. I have to concede what the Pierce case says on reasonable foreseeability. But in that case, in Pierce, the person lived far away and was never present in the bingo transactions that were involved in the Pierce case. In this case, Cox and McGrath saw each other at the gym weekly. They were very close friends. The facts just don't support reasonable foreseeability on those. So our argument on all of the subjunctive counts is that in the evidence in this case, there's just no evidence that my client on the wire and money laundering counts actually did anything with regard to that. And as we pointed out, there's no Pinkerton charge in this case. There was no charge given to the jury that would have allowed them to say, well, he's a conspirator and he should have known something like this might have been happening. That wasn't a basis that the jury could have convicted him on. And, therefore, you have to fall back to whether or not he did anything specifically about these specific counts. And there's just no evidence. And so we would ask the court to throw out those counts. I have a question, Mr. Patrick, about the mail fraud counts. So you posited some facts which suggest that it would have been equally reasonable, if not more so, for these statements to be hand-delivered. But is that the test? Is it that one is as equally reasonable as the other or that one is more reasonable than the other? I'm not sure that there's been a test other than it's reasonably foreseeable. What I'm saying in the Pierce case, they talked about the fact that it was reasonably foreseeable because the recipient did not live anywhere close by to where the information was being generated and had to get the information somehow. And because she, the recipient, was a woman in that case, did not live close by, had no real frequent connection with the person sending this stuff, that was enough for the court of appeals to say it was reasonably foreseeable the mail could be used. None of that exists in this case. I'd like to turn briefly to the willful blindness instruction. The Ginwright case, I think that's been cited by both sides on this, talks about when willful blindness should be given. And, of course, in this particular case at the charge conference, the government proposed a willful blindness instruction. The defendant objected to it being given. And then the judge overruled that objection and gave what is more or less a standard willful blindness instruction. And for purposes of this argument, I'm not talking about the content of the willful blindness instruction. I'm talking about whether it should have been given at all. Now, the Ginwright case, how the Fourth Circuit talked about when it is appropriate to give a willful blindness instruction, and it really focused in that case on the fact that there was evidence that the, it was a tax case that the defendant had said that they denied they knew anything was wrong. And secondly, that there was an evidence, as the court recounted, that he deliberately avoided knowledge. Now, in this case, there is absolutely no evidence about what Mr. Mayhew was doing about much of this. There's absolutely no evidence that he said he ever denied any, that this stuff was wrong. And there's no evidence that he had any deliberate attempt to avoid knowledge that it was wrong. So there's no... If there is no evidence accepting what you say is true, then where's the harm in the charge? Well, the question, I guess, really becomes is, you know, you've got a lot of discussion about his involvement in the overall conspiracy. But he's being charged with a lot of specific substantive accounts. And I think it would be easy for the jury, having heard that, to fuzz the requirements on the substantive accounts. I don't think there's, I can really argue there's much harm in terms of the conspiracy count in this case. But where you have a lot of substantive accounts, some of which he's involved with fairly directly, and some of which he is not, and there's no evidence that he has any connection with them, it almost becomes a little bit like a Pinkerton substitute. I mean, you know, it fuzzes what the requirements are to convict him of the substantive accounts. So I think that's the danger in this particular case. I'd also want to talk about the marked departure that occurred on sentence in this case. He was someone at a criminal history category of zero. Judge Fox both varied and departed upward to sentence him, not at 108 months, which would have been the low end of his guideline range, but the three times that, at 320 months. Now, he did that by, he articulated a couple of reasons for that. One was that my client had had some prior conduct in 2003 and 2005, and then he used that, and I'm not going to argue particularly about whether that was appropriate to increase his criminal history category from one to three. But then he proceeded to increase the offense level by six more levels, and again alluded to dismissed or uncharged conduct as a grounds for increasing the offense level by six levels, getting to a guideline range that included the 320 months. Now, the problems with that is that the things he was talking about, the dismissed conduct, they're all included in the offense conduct in the pre-sentence report. For example, the loss calculation in this case included the quantities that occurred after the length of this indictment. There were some additional charges that were brought against my client involving a sue transaction. They subsequently indicted him for that, and the government dismissed that. But in the pre-sentence report, there's about $300,000 worth of losses from that later activity that was included in the $2 million loss calculation. So, the offense conduct has already got that in it. When he talks about dismissed charges, that's the dismissed charges. The stuff that was going on on that occasion is included in the loss calculations. And the government, in part, talked about what my client was doing during that phase in justifying the role in the offense calculation.  But they talked and argued about the latter part of the conspiracy and what he was doing later, and that was part of their justification for the, I think, four-level increase that he sustained. Now, on top of all of that, the judge then goes and increases it by six more levels for this. Now, let me ask you a question about the leader-organizer role in the offense. Did the judge ever explain the basis for that enhancement? For example, did it involve five or more participants, or was it otherwise extensive? Did he ever explain what the basis was? He did not explain it. He just, I think, just overruled it. And it's very confusing, and I think we touched on this in our briefs and both sides did. The government tries to argue that it's otherwise extensive, and that's the way it justifies it. And part of that is because you've got the COCs and you've got banks in this case that are both alleged victims, but then they're trying to use them as criminal participants to justify the numbers that you need to get to a five participant on that. Okay. Let me ask you one other question related to sentencing. Is it your position that a judge who's going to give a variance must give notice to the defendant? No. I don't think the rule requires that, and I think that I may mispronounce it. The Azari Supreme Court case says that. But I think this court still says that in order for you to exercise your appellate review process, the trial judge has to explain what he's doing. And many of the same principles that apply in departure would apply in a variance. In this particular case, he seems to have relied on his justification by incorrect reasons. That is, stuff that had already been included in the adjustments that were made either to the criminal history, the role in the offense, to the loss calculations. All of that is, you know, I don't see anything outside those things that hadn't already been considered in reaching that. And then he increases the level. So what you wind up with is a sentence that's almost three times what the guideline range. What about the reference to the prior misconduct, the Ponzi scheme in Puerto Rico, and then the alleged misconduct while he was on pretrial release? The judge seemed to focus on that as a basis for enhancing the sentence. He did, but he'd already done that for the criminal history. He used that, the 2003 and 2005, to bump up the criminal history from one to three. And so he had already taken that into consideration before he even got to the sixth level offense calculation. I'm not sure if I answered your question, but it's pretty clear to me that that's what he based the criminal history on. Thank you. Thank you. Okay, you've got some time remaining for reply. Mr. Patrick, let's hear from Mr. Rubin. Good morning. May it please the Court. Philip Rubin on behalf of the United States. I have to say that this is a case of many that I've worked on that has really stuck with me, even though I just handled the appeal. And it has stuck with me because it's really quite an extraordinary white-collar fraud case. This defendant and Ron McCullough stole $2 million from 19 different victims. They had done the same thing for $2.5 million a decade before and gotten away with it. And then, while on pretrial release, rather than recognize that the law had finally caught up to him, this defendant commits $300,000 more in fraud. The same thing while disrespecting the authority of the district court and the authority of the law. And so when I think about this fraud, this wasn't an ordinary white-collar fraud case. It was completely unrepentant, it was relentless, and it was very large. And for those reasons, this defendant earned the jury's verdict of guilty, and he earned a 320-month sentence that accounts for the whole of that conduct. And so I want to turn to address both the issues that my colleague raised, and then I also do want to talk about the Leader Organizer Enhancement, Judge Traxler, that you mentioned. To start with the wire fraud counts, and this is counts 3 through 6 and 8. But before talking about those, I want to talk a little bit about count 2 with it. The defendant's not challenging count 2. That was the fraud against Priscilla and DuArthur Oates. He's not challenging that, but if you look at it, it looks an awful lot like counts 3 through 6 that he is challenging. It happened around the exact same time, April, May 2009. It involved the same pitch, the same scheme, and it wasn't just a generic Ponzi scheme. They would go and they would promise very specific returns in a very short time frame, and then with the Oates they said $50,000 in 10 days. And then, sure enough, it was a little more than 10 days, but $50,000 doubled to $100,000, they got their money, they said we want to invest again, and, of course, the slot for $50,000 had closed. Now it needed to be $250,000. It later became $300,000. All of this is under the guise of we're religious men. We are here to help other Christians. God has chosen us to help other Christians invest this money. That's a great jury argument, but how about get into the law and the issues? I will, Judge Traxler. I think that's the setup for these other counts because it played out the same way. The only difference was that McCullough was the one specifically out there recruiting investors, but from the beginning, and I'm responding specifically to the argument that David Mayhew didn't have anything to do with these counts. So from the beginning, you have McCullough telling Dukes and Stewart and Banks that he's working with his brother, David Mayhew, who's doing the trading. So your position is he's an aider and abetter to McCullough? It's actually both. He is an aider and abetter, and I think that's certainly proven, but it's actually that his involvement is direct. No, he wasn't at the meeting with Dukes and Stewart, but he didn't have to be to be directly involved in the fraud scheme. And so what you have, so the jury's already hearing this, and they're seeing it look an awful lot like what's going on at the same time. And then after that, they find out that when Dukes and Stewart were very unhappy about this money being taken from them, they eventually track down Defendant and McCullough to their house. This leads to the restaurant confrontation, and who shows up there but Defendant with McCullough with a gun saying the money's gone? What that does, what that tells me, is that it confirms what those victims had been told, that Defendant was involved in it. And so I think the evidence of Defendant's direct involvement, and of course at trial we demonstrated that Mr. Mayhew was, the account was in McCullough's name that the money was going to, but Mr. Mayhew was living off of that money. And so he absolutely was benefiting from it. So that's Counts 3 through 6. Count 8, I think, is even more clear, and I won't spend much time on it. I think it's well said in the briefing, but this was Cox soliciting McGrath to invest the money, and he testified that he was getting the information on how to do this from David and Ron, David Mayhew. And sure enough, around that time, Count 8 was in late 2010, Cox had testified McCullough was basically out of the picture. Starting around April, he didn't see him much, and by the end of 2010, he didn't see him at all. He was working with Mayhew, who was directing him. So those are the wire fraud counts. And I think defendant's direct involvement was proven, certainly given the standard of review to overturn a jury's verdict where they found that he was involved. On the mail fraud counts, I think the parties agree on a lot of things. We agree the standard is all it has to do is be reasonably foreseeable that these account statements would be mailed, and I think that absolutely was. That's what the jury was instructed that they had to find, and they found beyond a reasonable doubt. So I think we agree that the defendant was giving these numbers to Cox, and Cox had told defendant he was using these to make statements to give to McGrath. Of course it's reasonable. But he said he needed to send it to McGrath, didn't he? He did. He used the word send specifically, and I think that's totally plausible because account statements, even if I was best friends with my investment broker, if I had one, even if we went to the gym together, I would expect my account statements to be mailed to me professionally. At the very least, I think that's reasonably foreseeable, and beyond that, I don't think it can be said that if you view the evidence in the light most favorable to the government, no reasonable jury could have thought of it. So it doesn't matter the sort of the nature of the relationship, the geographic distance of the parties, none of that is relevant? I don't know that I think it's irrelevant. I think it's a jury argument. I think that's something that you argue to the jury that it wasn't reasonably foreseeable, but I think it's the kind of thing that if the jury doesn't accept it, I think that's understandable when you have evidence like this. I'd also note, I read the Pierce case a little differently. I would agree you don't have the friendship relationship, but unless I missed it, I don't see anything about there being a long geographic distance. I believe that the operator at this hospital did occasionally attend games at the bingo parlor, but I think it's neither here nor there, because I think ultimately it's really a fact-based inquiry that juries are best at. And in this case, I think it was foreseeable that when Cox said he was going to send statements to McGrath, that's exactly what he did with that info. And if it was a true knowledge requirement, maybe it would be a closer question, but it's just reasonably foreseeable. And I hope I answered your question, Judge Ciaz. If there's more questions on the mail fraud count, I would like to answer them. In that case, I'll turn to the willful blindness instruction. I'm mindful of the case law on this that says, and this is from Whittington and Ali, all that is necessary to get a willful blindness instruction is, quote, deliberate avoidance of knowledge. And I'm... What is the evidence in this case? I think in this case, even the appellate argument is essentially a blindness argument, because we already have the fact that you have to... What's the evidence? The evidence in this case is the fact that in order for a defendant not to have been involved, particularly in counts three through six and eight, he would have had to have been generally aware of these investments going on. After all, the evidence, he was there for count two with the oaths. Yet he wouldn't have known... Where is the evidence of willful blindness? It only needs to be... When you say he's aware of it, that's actual knowledge. Where's the evidence of willful blindness? I'm saying he's aware of the investments. He would have to be willfully blind as to the fraudulent nature of the scheme. And that would be an inference... Where's the evidence he's willfully blind? I think what the case law says is that all you need is evidence from which a jury could infer. The argument was, he's not even there for this. He wasn't there. How would he know? And so in that case, Your Honor, I really think that this court's case law tends towards the idea that it doesn't take much to get this instruction, especially since the instruction is so narrow. And that's the problem when you say it doesn't take much to get the instruction. You know, there's evidence there, and that's an issue or it's not. And the problem is when the judge gives a willful blindness charge, the jury presumes everything the judge tells me is important and relevant to this case. When the judge says charges willful blindness, it is an inference by the judge that there's evidence in this case this person knew about it but was deliberately blind as to the consequences. And it just has great danger, I think, when it's used inappropriately. I hear Your Honor's concern. I really do. And what I meant to convey was that the nature of the content of this instruction itself helps to alleviate the very problems that Your Honor is mentioning. I don't think that I can agree that a jury takes from an instruction like that that they are supposed to infer that willful blindness. I think we'd have a lot of jury instructions that would pose a lot of problems. But don't they, aren't they, couldn't they reasonably infer it's relevant to this case? I don't know, and I'm not prepared to say that. But what I can say is that this instruction in this court has said that the cautionary instruction at the end, the very same one given here, really alleviates the concerns Your Honor is talking about because what it says is it is, of course, entirely up to you as to whether you find deliberate ignorance or deliberate closing of the eyes in any inferences to be drawn from any such evidence. You may not conclude the defendant had knowledge, however, from proof of mistake, negligence, carelessness. But doesn't that infer that there is evidence in the record from which they could conclude willful blindness? I don't think so, and I really worry about the implication because there are a lot of jury instructions, a Pinkerton instruction, for example. So now if we take that logic, whenever a jury gets a Pinkerton instruction, it's a suggestion that they should think that the defendant was involved in any other acts of the conspiracy. In your case, in this particular case, you fall back on the fact that there's evidence of actual knowledge and so there would be no prejudice or harm from inappropriate willful blindness. Our primary theory in this is that there was actual knowledge, just as I argued with the counselor earlier. I think the court could just assume error or harmlessness and respond to that. I think perhaps I understood defense counsel to essentially say there wasn't probably a lot of harm from the instruction. If the court is concerned about it, I would certainly urge the court to take that approach to it. We do, however, I want to just make sure I'm clear. We do think that there was enough evidence to meet the LE standard, is that all you need are warning signs of criminality that might have been incurred. What seems to me what you're arguing is this guy, there's evidence he must have known. That's not willful blindness. That's just a general inference and a reasonable supposition you can draw from the reasonable inference you can draw from the evidence. Willful blindness is he knows of particular facts and he doesn't pursue them or doesn't ask any questions and that he is intentionally not doing that because he knows what the answer is going to be. And, Judge Shrestha, I agree with your statement. And I don't see the evidence of that in this case. And what I would say is I think it's easy in this to think of the government's argument as the only thing to look at, but I think we have to look at the government's argument and also the way it's characterized by the defense. Because, sure, our theory, absolutely we think he knew about it. We think, you know, you asked earlier, is it aiding and abetting? And I said, yeah, but it's also actual substantive offense. Absolutely that's our theory, but that wasn't their theory. And there's a chance they could convince the jury that, well, he's around all this stuff, but his name's not on the contracts. How does he know any of this is fake? There is that chance. And when you look at the closing statements in this case, you have defense counsel saying, why in the world, if he's part of this, why is his name not on it? Why is he not on the wires? Why is it not his account? All you need is an inference of deliberate blindness. And to the extent the defense was offering that up to the jury as a possibility, the instruction was appropriate, even if it wasn't our theory to begin with. But at any rate, I think harmlessness might be the best approach. While you're interrupted, I want to ask you a question about the sentencing enhancement with regard to rolling the offense. What basis did the district judge use to enhance in four levels for organizer and leader? So organizer and leader, so there actually was, and we talked about this, it's on page 43 of the response brief. There's a footnote where we cite to the specific parts of the Joint Appendix. The district court, after government counsel gave a fairly long argument about why it was otherwise extensive, the district court said, I think you're right, the objection is overruled. Now, of course, that's not just a super long explanation, but I don't think a district court's required to repeat verbatim what was just said. When a counsel says, here are our reasons, and a judge says, I think you're right, I think the court's adopting those reasons. And so I think that's a thorough enough explanation of the otherwise extensive prong. Now, we have argued on appeal that it was both otherwise extensive and that it involved five or more participants, and I think that's actually true for both of them. Some of this comes down to the fact that some of these participants may have started out as victims and eventually became aware of what was going on and were essentially working for Defendant McCullough and sort of a parsing between at what point were they a victim and at what point were they a participant. I think that's what the Commission put the otherwise extensive language in for, is to avoid us having to really decide at what moment did Travis Cox become a criminal participant. I'm switching gears on you. Yes, sir. This is a sentencing question. We require a district judge to give notice if he intends to enhance a sentence, but we don't apparently require notice for variance. That's right. Can you think of a reason why there would be notice for one and not the other? I can, and it's Rule 32H. I thought about this a lot, and I think that it is a historical artifact. Pre-Booker, you had case law that said there's a due process interest in being aware because everyone had an expectation they'd be sentenced within the guidelines range. And so you had a due process interest in knowing that that might not happen in your case. Rule 32H kind of embodies that in the Federal Rules of Criminal Procedure, and it requires that for a variance, which back then was all that existed. So then you had Booker, and eventually you had Irizarry, which said there's no longer any due process expectation. Prosecutors, defense attorneys, when you go into sentencing, you would hope for a guideline sentence maybe, but you can't predict you're definitely going to get one. And the PSR put him on notice as well. It did. In this case, it provided it, and Rule 32H accounts for that. I think Rule 32H is essentially left over. We don't dispute it. It's still the rule. Rule 32H requires that notice, and I think that's why for a departure, you must either give explicit notice or notice in the PSR, as we had in this case. But for a variance after Irizarry? Can I go back to the enhancement issue? So it's your position that any time a government lawyer makes an argument that contravenes the defense lawyer's argument, that a judge can simply say, I agree with you and that's good enough? I think when government counsel makes a detailed argument, or either it could be defense counsel. It's nothing about the government. When an attorney makes a detailed argument. What do you mean by detailed? What did he or she say that suggests that the result was foreordained? I think what government counsel below walked through the whole scheme about who all was involved in it, and there were a lot of people involved in the scheme, walked through who all was involved, the evidence at trial. I mean, it was a lengthy, and I know I don't have the whole sentencing transcript. Well, I do. But without going through every word of it, I think it was a pretty lengthy colloquy. And when a judge says, I think you're right. You know, here, if I made an argument and the court said, I think you're right, I would take that as meaning that you agree with my reasons. Well, I suppose you could say, I think the enhancement is proper. But generally, we require a little bit more of district judges, don't we? I actually think there would be a slight difference between I think the enhancement is proper and I think you're right. Because I think the enhancement is proper might mean I agree with the outcome, but not for the reasons you think. I think you're right, especially when we're debating a minute point, a very specific, was this otherwise extensive? And government counsel responds directly to defense counsel, and the government says, I think you're right. I think he's saying your argument is the one that I accept and I adopt. And I think that fits here. And I also think that the evidence of it being otherwise extensive or involving more than five participants was quite strong. And so I also think that, Judge Diaz, also another answer to your question is, it might depend on how close a question it is. It might depend on how extensive. Here, you had the defendant. You had Ron McCullough, clearly criminal participants. You had Banks. You had Cox. I think they were both victims who became participants. You had Chad McCullough, who not only hid money during the pretrial release activity, but he also was there with a gun at the restaurant incident. That's five. We're at five already. There's other individuals, Corey Maxwell, Jay Sue, Thomas Foody. In this case, it's not hard to get to that five number. And if you were to wonder whether any of those should count as criminal participants, I think it easily falls into otherwise extensive. And so I think what the district court was saying is that it was a pretty clear decision and that he was agreeing with government counsel's argument. I think that's okay. I think that you could have a case where the arguments are less precise and the district court statement about who it agrees with is less clear. But I think in this case, on these facts, I think it was sufficient. Particularly turning to the sentence as a variance, the district court's explanation for why it gave this sentence, this was a carefully calculated sentence by the district court based on very specific things. And the district court identified early on that it was a departure and a variance. I don't think anyone disputes. And the district court said. Meaning that it's a departure, but if I'm wrong, it's a variance? Well, this court has certainly affirmed that approach, and courts do use it. But I think when courts give alternative variances, this court has Savion Matute affirmed that approach. That's not what happened here? Here I actually think the court was giving the expressly in both paths. If you look at the statement of reasons, the court checked the box for departure under 4A1.3, 5K2.21, then on the other page, checked the box for variance and checked dismissed, uncharged conduct. In the court's sentencing explanation, part of it was about guidelines. Now it rings in the language of a departure. But then the court also said that the upward move, the departure and variance, was for likelihood the defendant will commit other crimes, the nature and circumstances of the incident offense, and the history and characteristics of the defendant. That's 3553A factors. That's the language of a variance. I agree. I guess what I'm asking you is this is not a case, is it where the judge got to a certain sentencing level by virtue of a departure and then said, oh, and by the way, I'm going higher because of a variance. That can't be right. No, I think he reached the same sentencing conclusion through two different routes. He got there as a departure, and he got there as a variance. And this court has said in cases like Riviera-Santana and others that if you have two routes to the same sentencing conclusion, this court will affirm even if it finds a problem with one of those routes, as long as the other one is okay. And so I think the easiest approach, the most straightforward one, would be to look at the variance and to say, and this was thoroughly explained, and I want to make sure that I respond. My colleague said that he doesn't see anything in the pretrial release conduct that wasn't accounted for in the guidelines range, and I would suggest that basically everything in the pretrial release conduct was not accounted for in the guidelines range. So, yes, $300,000 that he stole was included in the loss calculation. It didn't change the loss category. He was already over $1.5 million with or without the $300,000, and so it didn't change his guidelines range there. On top of that, it didn't change his offense level in any way, that conduct being considered relevant conduct. And so I think there's a real danger here that what would have happened is he would have bought 18 counts and gotten four for free. And the thing that absolutely, more than anything, was not accounted for in this guidelines range was the fact that this defendant engaged in this criminal conduct while he was out on pretrial release. Nothing accounted for that. And so you have the conduct in 2003 and 2005, which I don't think is disputed, and didn't account for anything in his guidelines range. And then you have this very egregious, we don't see this much. We don't see white-collar cases where people commit these kinds of serious crimes while on pretrial release. This is quite extraordinary. And that, in the 2003-2005 conduct, rendered his guidelines range inadequate. I think the district court crafted a very thorough explanation, and those were definitely its reasons. It was very clear about it. And so for that reason, I think this crime and its seriousness, and I see my time has expired, may I briefly just wrap up? I think this crime and its seriousness, 320 months is a serious sentence. We see these in drug cases all the time, and I cannot say that this crime is any less serious than even mid-level drug dealers moving a lot of weight. And so for these reasons, we ask that you affirm this judgment. Thank you. Thank you, Mr. Rubin. Mr. Patrick, you have some reply time. Thank you, Governor. Let me touch briefly on the question of aiding and abetting. I mean, the construction that the government gives to aiding and abetting is that if you're around the conspiracy about the same time, that's enough to prove aiding and abetting. Now, that would be a Pinkerton kind of approach to this, but aiding and abetting, a substantive offense requires that you actually do something about that particular transaction, and there's really no evidence as to the particular transactions that we challenged that this defendant did anything about those particular transactions. On willful blindness, we have conceded that maybe there's no prejudice as to the conspiracy count in this, but again, the government has pointed to absolutely no reason that they needed a willful blindness instruction in this case. And what it does is it creates a very dangerous instruction for the jury, and it may have allowed them on the substantive accounts in this case to kind of fuzz the requirements. Again, fuzzing maybe what they thought aiding and abetting was, or whatever, but there was absolutely no reason to have that kind of dangerous instruction in this case. On sentencing, you know, this is a variance and a departure case, but as I read what the district judge did in this case, it appears to me that he based the variance and the departure on exactly the same factors. It's not that he found certain factors justified that and then varied upward for some other reasons. The thing that you mentioned about the prior conduct, he already took the 2003 and 2005 conduct into consideration in the criminal history part of it. The fact that he had, and part of, and then on top of that, he increases the levels to get from about 160 or so months to 327 months by increasing the offense level six. Now, there's some analogs that you can look at on whether that degree of increase. I'm not here to argue that because he did something on pretrial release that the judge should not have taken that into consideration in sentencing. But what the judge did was increase it and almost double the guideline range in this case by looking at those factors. And if you look at the analogs on what the guidelines tell us about how much those increases should be, obstruction of justice is something that pops up in a lot of cases where somebody does something during the course after they've been indicted. They do something to obstruct justice. They talk to a witness or do something else. They have somebody talk to a witness. That's a two-level increase. Most of those kinds of things are one- or two-level increases, not six-level increases. And part of, I think, what is remarkable in this case is the extreme departure or variance that occurs after he's taken into consideration all of the factors. They're just not justified by the particulars that he's looking at. It's not just whether or not he's identified certain factors for a variance or a departure, but the degree of departure and whether or not he's identified analogs. He identified an analog for the criminal history adjustment, but I don't think he looked at any analogs and talked about any analogs that were out there and he could have thought about. And the other thing is the way this was done, while it may be under the rule and under ISRI and under a variance situation that you don't have to give notice of a variance, but I think the recommendation is you still let the counsel and the defendant comment about what you're talking about, how you're talking about varying. And really, if you read the transcript, what happened here was they had the full colloquy, they had all of the discussion, and then really right at the end he says, I'm varying and I'm departing upward to 320 months, and he pronounces the sentence. There was no discussion and no opportunity to counsel to discuss, well, maybe you got that wrong, maybe these things don't justify the degree of departure or the degree of variance in this case. That procedurally is a really troublesome thing about how this sentencing occurred in this case. What did the government request in terms of a sentence, do you recall? They did not ask for anything above the guideline in this case. They weren't asking for any kind of increase above the guideline. This is all the district judge. And so I can see that when that was announced, if I had not heard anything from the prosecution, I would have been floored as trial counsel for the defendant. All of a sudden I have a three-times guideline sentence being imposed in this situation. And that's pretty much, if you read the transcript, what happened here in terms of how the sentencing went. Thank you. My time has expired. I'll ask the clerk to adjourn court, and then we'll come down and re-counsel.
judges: William B. Traxler, Jr., Albert Diaz, Henry F. Floyd